UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

|  |  |  |
|---|---|---|
| EDWIN AGUILAR-ROBLERO; | : | |
| JOSE CRUZ-HERNANDEZ; | : | |
| MARCOS FLORES-REYES; | : | |
| VICTORINO HERNANDEZ-HERNANDEZ; | : | |
| JOEL HERNANDEZ-RAMOS; | : | |
| NEYMAELIN LOPEZ-MATIAS; | : | Civil Action No.: 5:23-cv-00010-LGW- |
| AGUSTIN MIGUEL-FELIX; | : | BWC |
| ROSENALDO RODRIGUEZ-VAZQUEZ; | : | |
| EMMANUEL ROMERO-GRAJALES; | : | |
| DAVID RUBIO-HERNANDEZ; | : | |
| ERICK ZAVALA-HERNANDEZ | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| NERY RENE CARRILLO-NAJARRO; | : | |
| ASOCIACION CAMPESINA DE | : | |
| DESARROLLO DE LAS COMUNIDADES DE | : | |
| GUATEMALA, LLC; | : | |
| TRIPLE T FAMILY FARMS, LLC; | : | |
| KRYSTAL CARTER TANNER, | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.     Plaintiffs Edwin Aguilar-Roblero, Jose Cruz-Hernandez, Marcos Flores-Reyes, Victorino Hernandez-Hernandez, Joel Hernandez-Ramos, Neymaelin Lopez-Matias, Agustin Miguel-Felix, Rosenaldo Rodriguez-Vazquez, Emmanuel Romero-Grajales, David Rubio-Hernandez, and Erick Zavala-Hernandez (collectively, the "Plaintiffs"), file this First Amended Class Action Complaint on behalf of a class of over 400 H-2A visa holders (collectively, the "other class members") against Defendants Nery Rene Carrillo-Najarro and Asociacion Campesina de

Desarrollo de las Comunidades de Guatemala, LLC (the "Contractors"), and Triple T Family Farms, LLC and Krystal Carter Tanner (the "Growers") (the Contractors and the Growers collectively are referred to herein as the "Defendants").  By this action, the Plaintiffs and other class members seek to recover compensation for the Defendants' labor trafficking, as well as to punish the Defendants for their wrongful, immoral, and pernicious violations of numerous federal and state laws.

2.      On behalf of themselves and other class members, the Plaintiffs bring this action to vindicate their rights under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595 and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").

3.      The Defendants used the H-2A visa program to bring Plaintiffs and other class members to Georgia and force them to work in dangerous conditions with little to no pay, housed them in substandard housing, and subjected them to ongoing abuse.

4.      The Contractors  misrepresented the material terms and conditions of employment, including the pay and living conditions, and charged various unlawful fees to Plaintiffs and other migrant farmworkers, which were never reimbursed.  The Contractors then laundered the unlawful profits from their scheme, including through the Seminole Hard Rock Hotel and Casino.

5.      As a result of Defendants' actions, Plaintiffs and other class members suffered significant economic and psychological harm.

6.      Plaintiffs, on behalf of themselves and other class members, seek unpaid wages, liquidated damages, , general and special damages, punitive damages, emotional distress damages, pre- and post-judgment interest, costs, and reasonable attorneys' fees.

VP/#62947478.5

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the laws of the United States; under 29 U.S.C. § 1337, as this action arises under acts of Congress regulating interstate commerce; 18 U.S.C. § 1595(a), as this action arises out of violations of Title 18, Chapter 77 of the United States Code; and under 29 U.S.C. § 216(b), as this action arises under the FLSA.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(d) and S.D. Ga. Local Rule 2.1, because a substantial part of the events or omissions giving rise to the claim occurred in this district and division, and because one of the Defendants' primary places of business is in a county within this district and division.

## PARTIES

### The Representative Plaintiffs

9.     Plaintiffs are citizens of Mexico who were admitted into the United States in 2021 to work for Defendants under the H-2A program.[1]

10.     Plaintiffs are from rural, impoverished areas of Mexico where there are few opportunities for gainful employment, and no opportunities for earning wages comparable to those promised under the H-2A program.

11.     Plaintiffs' FLSA consent forms are attached as **Exhibit A**.

12.     At all times relevant to this action, the Plaintiffs were employees of the Defendants.

---

[1] 8 U.S.C. § 1188 and 20 C.F.R. § 655.0 *et seq.*

VP/#62947478.5

## The Contractors

13.     Defendant Nery Rene Carrillo-Najarro ("Carrillo") is an individual residing in Ben Hill County, Georgia, and is an officer and/or owner of Asociacion Campesina de Desarrollo de las Comunidades de Guatemala, LLC.

14.     Defendant Carrillo is an H-2A Labor Contractor ("H2ALC") because he recruited, solicited, hired, employed, furnished, housed, and/or transported H-2A workers, and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association.[2]

15.     Defendant Asociacion Campesina de Desarrollo de las Comunidades de Guatemala, LLC. ("Asociacion") is a Georgia limited liability company, with its principal address within Coffee County, Georgia, and whose registered agent, Liborio Saavedra, can be served at 204 Circle Drive, Douglas, Georgia 31533.

16.     Defendant Asociacion is an H2ALC because it recruited, solicited, hired, employed, furnished, housed, and/or transported H-2A workers, and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association.

## The Growers

17.     Defendant Triple T Family Farms, LLC ("Triple T Family Farms") is a Georgia limited liability company, with principal address within Johnson County, Georgia, and whose registered agent, Krystal Tanner, can be served at 156 Ohoopee River Road, Wrightsville, Georgia 31096.

---

[2] See definition of "H-2A labor contractor" at 20 C.F.R. § 655.103.

18.     Defendant Triple T Family Farms is a fixed-site employer because it owns or operates a farm, or other similar fixed-site location where agricultural activities are performed, and because it recruits, solicits, hires, employs, houses, or transports H-2A workers as incident to or in conjunction with the owner's or operator's own agricultural operation.[3]

19.     Defendant Krystal Carter Tanner ("Tanner") is an individual residing in Johnson County, Georgia, and is an officer and/or owner of Triple T Family Farms.

20.     Defendant Tanner is a fixed-site employer because she owns or operates a farm, or other similar fixed-site location where agricultural activities are performed, and because she recruits, solicits, hires, employs, houses, or transports H-2A workers as incident to or in conjunction with the owner's or operator's own agricultural operation.

21.     Defendant Triple T Family Farms and the other Defendants jointly employed the Plaintiffs and other class members during the 2021 harvest season.

<u>All Defendants</u>

22.     At all relevant times, the Defendants were a "venture" within the scope of 18 U.S.C. § 1595(a).

23.     The Defendants recruited and then transported Plaintiffs and other class members, or caused Plaintiffs and other class members to be recruited and transported, from Mexico to Georgia to work.

24.     At all times relevant, Defendants were an enterprise engaged in commerce or in the production of goods for commerce because Defendants had employees handling, selling, or otherwise working on goods or materials that had been moved in or produced for commerce.[4]

---

[3] *See* definition of "fixed-site employer" at 20 C.F.R. § 655.103(b).
[4] *See* definition of "commerce" at 29 U.S.C. § 203(b).

VP/#62947478.5

25.     Upon information and belief, Defendants operate an enterprise whose annual gross volume of sales or business done is not less than $500,000.[5]

## STATEMENT OF FACTS

### Statutory and Regulatory Structure of the H-2A Program

26.     Foreign nationals cannot work in the United States without prior authorization from the United States government.  Foreign nationals can obtain work authorization in the United States if a qualifying sponsor, an employer based in the United States, petitions the United States government for a nonimmigrant visa on their behalf.  A nonimmigrant visa that authorizes foreign nationals to work for an agricultural employer is called an "H-2A visa."

27.     An agricultural employer in the United States may bring temporary foreign nationals ("H-2A workers") to the United States if the United States Department of Labor ("USDOL") certifies that (1) there are not enough U.S. workers to perform the job, and (2) the employment of H-2A workers will not adversely affect the wages and working conditions of U.S. workers who are similarly employed.  These provisions, along with the implementing federal regulations, are commonly referred to as the "H-2A program."

28.     Under the H-2A program, prospective employers must file Form ETA 9142A, H-2A Application for Temporary Labor Certification ("Labor Certification Application") with the USDOL's Employment and Training Administration.

29.     The application must include a Form ETA 790, Agricultural Clearance Order ("Job Order").

30.     The Job Order is used in the recruitment of both U.S. and H-2A workers, is the job offer, and becomes the work contract of the employed workers.

---

[5] *See* definition of "enterprise" at 29 U.S.C. § 203(r)(1).

31.     The employer submits the Job Order to the State Workforce Agency ("SWA") in the state where the work will be performed.

32.     In Georgia, the SWA is the Georgia Department of Labor ("GADOL").

33.     If an employer's Job Order appears to meet the minimum federal regulatory requirements and otherwise appears valid, the SWA approves the Job Order, and U.S. worker availability is tested by use of the interstate employment service system and by the employer's own hiring efforts.  If it is determined that sufficient U.S. workers are not available to fill the jobs, the USDOL certifies the need for temporary foreign workers, and the Department of Homeland Security issues H-2A visas for the number of job opportunities requested by the employer and not filled by U.S. workers.

34.     The Job Order must comply with the applicable H-2A regulations that establish the minimum benefits, wages, and working conditions that must be offered to avoid adversely affecting similarly employed U.S. workers.

35.     The H-2A regulations require, in part, the following:

(a)     If the worker is paid by the hour, the employer must pay the worker at least the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the federal or state minimum wage rate in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period.

(b)     If the worker is paid on a piece-rate basis, and the worker's earnings do not result in average earnings of, at least, the AEWR, then the worker's pay must be supplemented so that the worker's earnings are, at least, as much as the worker would have earned had the worker been paid the AEWR.

(c)     The employer either must provide each worker with three meals per day or must furnish free and convenient kitchen facilities to the workers so that the workers can prepare their own meals.  Where the employer provides the meals, the job order must state the charge, if any, to the worker for such meals.

(d)     The employer must provide housing to the workers, free of charge, and the housing must meet federal and local legal standards.

(e)     The employer must keep accurate and adequate records with respect to the workers' earnings, including but not limited to: field tally records, supporting summary payroll records, and records showing the nature and amount of the work performed; the number of hours of work offered each day by the employer; the hours actually worked each day by the worker; the time the work began and ended each workday; the rate of pay (both piece rate and hourly, if applicable); the worker's earnings per pay period; the worker's home address; and the amount of and reasons for any and all deductions taken from the worker's wages.

(f)     The employer must furnish to each worker, on or before each payday, a written statement that includes, among other items: the worker's total earnings for the pay period; the worker's hourly rate and/or piece rate of pay; the hours of employment offered to the worker; the hours actually worked by the worker; an itemization of all deductions made from the worker's wages; and, if piece rates are used, the units produced daily.

(g)     The employer must provide to each H-2A worker, no later than the time at which the worker applies for the visa, a copy of the work contract between the employer and the worker in a language understood by the worker as necessary or reasonable.

36.     Once the USDOL approves the Labor Certification Application, the employer transmits it and Form I-129, Petition for Nonimmigrant Worker (the "Petition"), to U.S. Citizenship and Immigration Services ("USCIS") indicating, among other things, the total number of H-2A visas the employer is requesting.

37.     After USCIS approves the Petition, the prospective worker applies for the H-2A visa and admission to the United States through a U.S. embassy or consulate.  If the worker is determined to be admissible, the H-2A visa is issued, permitting the worker to enter the United States and perform paid work in agriculture for an agricultural employer during a specific period of time.

38.     Under the H-2A visa program, a qualifying sponsor or employer is required to pay the foreign worker the AEWR or a higher corresponding wage rate under the terms of the contract with pay stubs that accurately list the workers' pay, hours worked, deductions, and earnings.

39.     A qualifying sponsor or employer is also required to pay up front or reimburse workers in the first work week for costs associated with obtaining the H-2A visa, border crossing fees, reasonable transportation, lodging, food expenses, and the reasonable costs associated with returning to their home countries.

<u>The Overall Human Trafficking Scheme</u>

40.     In 2021, in an effort to exploit the Plaintiffs and other class members and cheat the federal immigration and visa laws for financial gain, the Contractors caused to be mailed and/or electronically transmitted multiple false job orders to the GADOL and H-2A petitions to the United States government seeking over 450 foreign workers to enter the United States to work for agricultural employers, and fraudulently caused the United States to issue thousands of H-2A visas to foreign nationals.

9

41.     The Contractors exploited the Plaintiffs and other class members by demanding they pay excessive and illegal fees for the opportunity to come to the United States on an H-2A visa and work in the United States.

42.     The Contractors exploited the Plaintiffs and other class members by lying to the Plaintiffs and other class members by falsely guaranteeing that once in the United States, the Plaintiffs and other class members would be paid under the terms of a contract, with transportation, housing, and food provided.

43.     The Contractors further exploited the Plaintiffs and other class members by requiring them to pay for their costs associated with obtaining the H-2A visa, border crossing fees, transportation fees, lodging fees, and food expenses.

44.     The Contractors exploited the Plaintiffs and other class members by holding their immigration and identification documents hostage to prevent them from leaving or from contacting law enforcement.

45.     The Contractors exploited the Plaintiffs and other class members by requiring them to perform physically demanding work in agricultural fields in the United States for little or no pay.

46.     When payday did come, the Plaintiffs and other class members were paid in cash and without pay stubs that accurately listed their pay, hours worked, deductions, or earnings.

47.     The Contractors exploited the Plaintiffs and other class members by forcing them to live in crowded, unsanitary, and degrading living conditions, and by threatening them with deportation and violence.

48.     The Contractors further exploited the Plaintiffs and other class members by forcing them to pay additional fees to get their passports or H-2A visas back from the Traffickers.

VP/#62947478.5

49.     The Contractors further exploited the Plaintiffs and other class members by coercing them to pay substantial sums as a condition of leaving their employment.

50.     The Contractors and other members have reaped enormous profits from the illegal scheme, laundering the funds through cash purchases of land, homes, vehicles, and businesses; through cash purchases of cashier's checks; and by funneling money through cash deposits made at casinos, including, upon information and belief, the Seminole Hard Rock Hotel and Casino in Tampa, Florida.

51.     The Growers (1) hired the Contractors to recruit, transport, and provide the Plaintiffs and other class members to the Growers for forced labor; (2), knowingly benefited financially from this venture the Growers knew or should have known was subjecting the Plaintiffs and other class members to forced labor, and/or conspired with the Contractors in this forced labor scheme.

<u>The Employment Contracts</u>

**The First 2021 Job Order**

52.     On or around December 15, 2020, the Contractors  submitted job order number H-300-20302-890520 (the "First 2021 Job Order") to the GADOL, and an Application for Temporary Employment Certification to the USDOL.

53.     On or around November 6, 2020, Defendant Carrillo signed the "Employer's Certification" in the First 2021 Job Order.

54.     In the First 2021 Job Order, Carrillo signed the following Employer's Certification:

(a)     "I declare under penalty of perjury that I have read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of my knowledge, the information contained therein is true and

accurate.  This clearance order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job.  20 C.F.R. § 653.501(c)(3)(viii).  I understand that to knowingly furnish materially false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a federal offense punishable by fines, imprisonment, or both.  18 U.S.C. 2, 1001.”

55.    The approved First 2021 Job Order (attached as **Exhibit C**) included, but was not limited to, the following terms:

(a)    A prohibition against the employer and its agents seeking or receiving payment from any worker for application fees and recruitment costs.

(b)    Period of employment of 1/10/2021 through 10/10/2021.

(c)    Anticipated hours of work of at least 35 hours per week.

(d)    Job duties described as farm labor related to squash, cabbage, lettuce, green beans, and watermelons.

(e)    An hourly wage of not less than the AEWR, or $11.71 per hour for work performed within year 2021 through February 22, 2021.

(f)    A weekly pay period.

(g)    Free housing that met local, state, and federal requirements, including adequate kitchen facilities with utensils to allow workers to cook their own meals.

(h)    Weekly trips to a food store and a laundry facility.

(i)    That three meals a day would be provided for workers.

12

(j)     Guaranteed employment for a total number of work hours equal to at least three-fourths of the workdays of the total work period was advertised in each respective job order, or the monetary equivalent if the hours were not offered.

(k)     Defendant Triple T Family Farms, LLC's property in Wrightsville, Georgia would be the place of employment.

56.     The terms and conditions of the First 2021 Job Order, together with the requirements of 20 C.F.R. § 655, constituted a job offer.

57.     The job offer, when accepted, created a work contract between the Contractors and the Plaintiffs and other class members who accepted the offer.

58.     The Growers ratified the contract by permitting the Contractors to list Triple T Family Farms, LLC as the place of employment.

59.     The work contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws" including the FLSA and the TVPA.

60.     By promising to pay the federally mandated wage rate, the Defendants also promised to pay that wage free and clear without deductions for items for the employers' benefit or without reducing the workers' wages by shifting costs to those workers.

61.     The Employer's Certification in the First 2021 Job Order certifies that the job order "describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job."

62.     When Defendant Carrillo signed the Employer's Certifications in the First 2021 Job Order, he knew some of the representations were false.

VP/#62947478.5

63.     When Defendant Carrillo signed the Employer Certifications, he knew the following statements to be true:

(a)     That the Contractors would charge their workers, including the Plaintiffs and other class members, various fees associated with H-2A recruitment and employment, including transportation and rent.

(b)     That the Defendants would use the H-2A workers, including the Plaintiffs and other class members, for job duties that were not authorized under the Job Orders.

(c)     That the Defendants would not pay to their H-2A workers, including the Plaintiffs and other class members, the wage rates offered in the respective job orders, as required by law.

(d)     That the Defendants would not provide the H-2A workers, including the Plaintiffs and other class members, housing that met minimum standards required by law.

(e)     That the Contractors would sell the workers to other employers for employment at worksites not set forth in the First 2021 Job Order.

64.     In reliance on Defendant Carrillo's false declarations, under penalty of perjury, in the First 2021 Job Order, the USDOL approved the Job Order and allowed for the certification of recruitment of 99 foreign guest workers, including the Plaintiffs and other class members.

65.     In reliance on Defendant Carrillo's certifications in the First 2021 Job Order, the GADOL approved the 2021 Job Order.

66.     On or about November 6, 2020, Defendant Carrillo submitted the approved Job Order along with a Labor Certification Application to the USDOL.

14

67.     In reliance on Defendant Carrillo's certifications in the First 2021 Job Order and the Labor Certification Application, the USDOL approved the 2021 Labor Certification Application.

**The Second 2021 Job Order**

68.     On or around March 9, 2021, Defendant Carrillo submitted job order number H-300-21019-021329 (the "Second 2021 Job Order") to the GADOL, and an Application for Temporary Employment Certification to the USDOL.

69.     On or around January 28, 2021, Defendant Carrillo electronically signed the "Employer's Certification" in the Second 2021 Job Order.

70.     In the Second 2021 Job Order, Defendant Carrillo signed the following Employer's Certification:

(a)     "I declare under penalty of perjury that I have read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of my knowledge, the information contained therein is true and accurate.  This clearance order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job.  20 C.F.R. § 653.501(c)(3)(viii).  I understand that to knowingly furnish materially false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a federal offense punishable by fines, imprisonment, or both.  18 U.S.C. 2, 1001."

71.     The approved Second  2021 Job Order (attached as **Exhibit D**) included, but was not limited to, the following terms:

(a)     A prohibition against the employer and its agents from seeking or receiving payment from any worker for application fees and recruitment costs.

(b)     Period of employment of 3/20/2021 through 9/20/2021.

(c)     Anticipated hours of work of at least 35 hours per week.

(d)     Job duties described as farm labor related to blueberries.

(e)     An hourly wage less than the AEWR of $11.71 for work performed from March 20, 2021 to September 20, 2021.

(f)     A piece rate of $0.50 per pound.

(g)     A weekly pay period.

(h)     Free housing that met local, state and federal requirements, including adequate kitchen facilities with utensils to allow workers to cook their own meals.

(i)     Free weekly trips to a food store and a laundry facility.

(j)     That three meals a day would be provided for workers seven days a week.

(k)     Guaranteed employment for a total number of work hours equal to at least three-fourths of the workdays of the total work period advertised in each respective job order, or the monetary equivalent if the hours were not offered.

72.     The terms and conditions of the Second 2021 Job Order, together with the requirements of 20 C.F.R. § 655, constituted a job offer.

73.     The job offer, when accepted, created a work contract between the Contractors and the Plaintiffs and other class members who accepted the offer.

74.     Upon information and belief, the Growers ratified the contract by agreeing the Plaintiffs and other class members recruited and hired pursuant to the Second 2021 Job Order would be employed at the Growers' operations.

16

75.     The work contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws" including the FLSA and the TVPA.

76.     By promising to pay the federally mandated wage rate, the Defendants also promised to pay that wage free and clear without deductions for items for the employers' benefit or without reducing the workers' wages by shifting costs to those workers.

77.     The Employer's Certification in the Second 2021 Job Order certifies that the respective job order "describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job."

78.     When Defendant Carrillo signed the Employer's Certifications in the Second 2021 Job Order, he knew some of the representations were false.

79.     In reliance on Defendant Carrillo's certifications in the Second 2021 Job Order, the GADOL approved the Second 2021 Job Order.

80.     When Defendant Carrillo signed the Employer Certifications, he knew the following statements to be true:

(a)     That the Contractor would charge their workers, including the Plaintiffs and other class members, various fees associated with H-2A recruitment and employment, including transportation and rent.

(b)     That the Defendants would use the H-2A workers, including the Plaintiffs and other class members, for job duties that were not authorized under the Job Orders.

(c)     That the Defendants would not pay to their H-2A workers, including the Plaintiffs and other class members, the wage rates offered in the respective Job Orders, as required by law.

VP/#62947478.5

(d)     That the Defendants would not provide the H-2A workers, including the Plaintiffs and other class members, housing that met minimum standards required by law.

81.     In reliance of Defendant Carrillo's false declarations, under penalty of perjury, in the Second 2021 Job Order, the USDOL approved the job order and allowed for the certification of recruitment of 330 foreign guest workers, including the Plaintiffs and other class members.

82.     In reliance on Defendant Carrillo's certifications in the Second 2021 Job Order, the GADOL approved the Second 2021 Job Order.

83.     On or about March 9, 2021, Defendant Carrillo submitted the approved Job Order along with a Labor Certification Application to the USDOL.

84.     In reliance on Defendant Carrillo's certifications in the Second 2021 Job Order and the Labor Certification Application, the USDOL approved the 2021 Labor Certification Application.

<u>Recruitment</u>

85.     In 2020 and 2021, Defendants' agents recruited the Plaintiffs and other class members to work for the Defendants as H-2A visa workers in the United States.

86.     During these recruiting meetings, Defendants' agents promised the Plaintiffs and other class members an opportunity to work in the United States harvesting various fruits and vegetables including broccoli, watermelon, blueberries, blackberries, and green beans, at a higher hourly wage rate than the Plaintiffs and other class members actually earned.

87.     Defendants' agents represented that the Plaintiffs and other class members could earn approximately $12.00/hour harvesting fruits and vegetables or $3.00/bucket for blueberries.

88.     Defendants' agents represented that the Plaintiffs would not have to pay for housing or transportation during their term of employment.

18

89.     Defendants' agents represented to the Plaintiffs and other class members that the term of employment would be between eight and ten months.

90.     Defendants' agents knew the representations they made to the Plaintiffs and other class members were false.

91.     The terms and conditions of the First 2021 Job Order and the Second 2021 Job Order, together with the requirements of 20 C.F.R. § 655, constituted offers of employment.

92.     Relying on the Defendants' promises of gainful employment, each of the Plaintiffs and other class members accepted the offer of employment.

93.     The offer of employment, when accepted, created an employment contract between the Defendants  and each of the Plaintiffs and other class members who accepted the offer.

94.     Relying on the Defendants' promises of gainful employment under the terms of the job offers, the Plaintiffs and other class members accepted the offer of employment.

95.     The Plaintiffs' and other class members' native language is Spanish, and they cannot read English.

96.     The Contractors  failed to give any of the Plaintiffs and other class members a copy of the employment contract translated in "a language understood by the worker[s]," as required by 20 C.F.R. § 655.103(q).

<u>Pre-Employment Expenses</u>

97.     The Plaintiffs and other class members incurred various immigration, processing, lodging, and travel expenses in order to come to the United States to work for the Defendants.

98.     Defendant Carrillo, as an agent of the other Defendants, demanded from each of the Plaintiffs and other class members upfront payments of 46,000–70,000 Mexican pesos, or

approximately $2,500–$3,870 USD, per person to sign up for the opportunity to work in the United States.

99.     Relying on Contractors' promises of gainful employment, each of the Plaintiffs and other class members accepted the offer of employment and paid Defendant Carrillo's agents the demanded fees.

100.    Defendants' agents also informed the Plaintiffs they would need to pay additional fees to obtain their H-2A visas.

101.    Thereafter, the Plaintiffs and other class members each traveled to Monterrey, Mexico to the U.S. consulate to wait for their H-2A visas to be processed.  They stayed in a hotel in Monterrey while waiting to receive their H-2A visas.

102.    The Plaintiffs and other class members each incurred expenses for travel and lodging during their trip to, and time spent in, Monterrey to obtain the H-2A visas.

103.    After each of the Plaintiffs and other class members had obtained their H-2A visas, they then traveled to the United States.

104.    After paying the required fees to the Contractors, the Plaintiffs and other class members were required to pay additional expenses in order to travel to Georgia to work.

105.    The expenses described above were costs necessary to enter the United States as an H-2A worker and were incurred for the benefit of Defendants, as defined by 29 C.F.R. §§ 531.32(c) and 778.217.

106.    The Plaintiffs and other class members incurred the expenses before receipt of their first paychecks.

107.    The Plaintiffs and other class members took loans to pay the fees required by the Defendants and to pay travel expenses.

108.    The Defendants never reimbursed Plaintiffs and other class members for any of the expenses the Plaintiffs and other class members incurred to obtain their visas, the recruitment fees paid to Defendant Carrillo, or any other expenses related to their travel and lodging in Mexico and Georgia.

109.    The employment contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws," including the FLSA and the TVPA.

110.    By promising to pay the federally mandated AEWR, the Defendants also promised to pay that wage free and clear without deductions for items for the employers' benefit and without reducing the workers' wages by shifting costs to the workers.

111.    The Defendants' failure to reimburse the Plaintiffs and other class members for these pre-employment expenses brought the Plaintiffs' and other class members' wages below the federal minimum wage and the AEWR.

112.    The expenses the Plaintiffs and other class members paid as described above were contrary to Defendant Carrillo's sworn declaration to USDOL in the First 2021 Job Order and the Second 2021 Job Order—and the certifications to the GADOL in the respective 2021 Job Orders— that (a) Defendant Carrillo and his agents had not sought and received, and would not seek and receive, payments from the Plaintiffs and other class members for activities related to labor certification, and (b) Defendant Carrillo would forbid foreign labor recruiters from receiving these payments.

<u>Wages, Working and Housing Conditions</u>

113.    Upon their arrival in Georgia, the Plaintiffs and other class members were housed in a hotel.  The hotel had bunk beds, limited insulation, broken appliances, no potable water, and

VP/#62947478.5

pests.  They each shared a room with multiple other workers.  Many of the workers were required to share beds.

114.    The Plaintiffs and other class members each stayed in the hotel for the first part of their stay in Georgia, some for only three days, but others for up to several months.

115.    After moving out of the hotel, the Plaintiffs and other class members were housed in four trailers in a small trailer park.  One of the four trailers was empty.

116.    The trailers were also dirty and run down with no air conditioning or heat, and holes in the floor.  The roofs leaked when it rained.  There were also rats and cockroaches.

117.    Each trailer housed between 15–18 workers, with only a single bathroom.

118.    The workers slept in bunkbeds, with the top bunk being too tall for the trailer, so some of the workers had to move their mattresses to the floor.

119.    The stove did not work in one of the trailers, so the Plaintiffs and other class members were forced to replace it with the stove from the empty trailer.  They also had to fix the bathroom and refrigerator in one of the trailers.

120.    Upon arriving at the trailers, the Contractors confiscated the Plaintiffs' and other class members' immigration documents, including their passports and visas.  The Contractors represented to the Plaintiffs and other class members that the Defendants needed the documents for insurance and COVID-19 vaccines.

121.    The Plaintiffs and other class members started working within one to three weeks upon their arrival.

122.    Despite being told they would be harvesting fruits and vegetables, the Plaintiffs and other class members were also ordered to perform manual labor making pine straw bales and packing watermelons.

VP/#62947478.5

123.    The Plaintiffs and other class members did landscaping work at residential houses, did electrical work for the trailers in which they were staying, and worked at various convenience stores.

124.    The Plaintiffs and other class members' work making pine straw bales was not agriculture or secondary agriculture within the meaning of the FLSA.

125.    Despite being told that they would earn up to $12.00 an hour or $3.00 per bucket of blueberries, the Plaintiffs and other class members were paid less than the wages Defendants and their agents promised.

126.    In some instances, Plaintiffs did not receive wages at all despite working full days.

127.    The Defendants did not supplement the Plaintiffs' and other class members' weekly earnings to ensure they received the wages required by the FLSA and their employment contracts.

128.    The Plaintiffs and other class members never received any reimbursement for any fees they paid to Contractors for rent or transportation or for any deductions from their pay.

129.    The Defendants failed to make, keep, preserve, and retain accurate employment records, as required by the FLSA and by the H-2A regulations.

130.    The Defendants did not provide the Plaintiffs and other class members with complete and regular earning statements containing the information required by the H-2A regulations.

131.    The Defendants did not pay overtime premiums equal to one-and-a-half the Plaintiffs' and other class members' regular rate of pay during workweeks when the Plaintiffs and other class members performed work that was not agriculture or secondary agriculture, as defined by the FLSA.

132.    The Defendants' failure to pay the wages required by the FLSA and the employment contract were contrary to Defendant Carrillo's sworn declaration to USDOL in the first 2021 and second 2021 Labor Certification Applications and representations to the GADOL and to Plaintiffs and other class members in the First 2021 and the Second 2021 Job Orders that Defendant Carrillo would pay the required wages.

133.    To the extent the Growers did not directly commit the acts and omissions described above, they conspired with the Contractors by knowingly providing support to the violations of the sworn declaration to USDOL in the 2021 Labor Certification Applications and representations to the GADOL and to the Plaintiffs and other class members in the First 2021 Job Order and the Second 2021 Job Order.

134.    As a result of the working and housing conditions the Plaintiffs and other class members endured during their time in Georgia, they suffered economic injuries and emotional distress, including stress, fear of serious injury, worry and/or anxiety.

<u>The Labor Trafficking</u>

135.    The Defendants recruited or conspired to recruit the Plaintiffs and other class members in Mexico.

136.    The Plaintiffs and other class members are poor and from impoverished communities with limited opportunities for employment and education.

137.    The Defendants sought out workers from impoverished backgrounds and limited understanding of the U.S. legal system.

138.    During recruitment, the Defendants knowingly made or conspired to make false promises to the Plaintiffs and other class members about the wages and conditions of the offered employment.

VP/#62947478.5

139.    The Defendants required or conspired to require the Plaintiffs and other class members to pay substantial recruitment fees.

140.    The Plaintiffs and other class members took out loans to pay the required fees and expenses.

141.    The Defendants knew or should have known the Plaintiffs and other class members would need to take out loans to pay the required fees and expenses.

142.    After making the pre-employment payments to the Contractors, the Plaintiffs and other class members still had to pay additional travel expenses in order to travel to Georgia to work.

143.    Once in the United States, the Defendants confiscated or conspired to confiscate Plaintiffs' passports to prevent them from escaping.

144.    When the Plaintiffs and other class members arrived in Georgia, the Defendants housed the Plaintiffs and other class members in substandard housing.

145.    The Defendants forced the Plaintiffs and other class members to perform arduous labor without adequate access to food, water, or rest.

146.    The Defendants  forced Plaintiffs and other class members to work without compensation or for substandard wages.

147.    The Defendants  threatened or conspired to threaten the Plaintiffs and other class members with the loss of any future H-2A visa opportunities if the Plaintiffs and other class members left their employment with Defendants.

148.    Defendant Carrillo carried a firearm while monitoring the Plaintiffs and other class members when they were working.

149.    Defendant Carrillo berated the Plaintiffs and other class members with insults and vulgarities at numerous times to maintain Plaintiffs and other class members in a state of apprehension.

150.    Defendant Carrillo repeatedly threatened, or caused Plaintiffs to be threatened, that any worker who left the employment would be reported to immigration.

151.    The Plaintiffs and other class members reasonably believed Defendant Carrillo's threats.

152.    The Defendants threatened or conspired to threaten the Plaintiffs and other class members with significant debt to prevent the Plaintiffs and other class members from leaving the Defendants' employment, in that the Contractors would require the Plaintiffs and other class members to pay a certain amount of money to the Contractors to be released from the contract.

153.    Because the Defendants  did not pay the Plaintiffs and other class members all their earned wages, and because the Plaintiffs and other class members had to pay for travel and recruitment expenses, the Plaintiffs and other class members had little or no money while in Georgia.

154.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Defendants  because the Defendants confiscated or conspired to confiscate their passports.

155.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Defendants because they feared legal or violent retaliation from Contractors.

156.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Defendants because they feared being unable to repay the loans the Defendants induced or conspired to induce them to take out.

157.     Despite wanting to leave, the Plaintiffs and other class members continued to work for the Defendants  because Defendants caused or conspired to cause them to feared being deported and/or being unable to return to the United States with an H-2A visa.

158.     During  the  Plaintiffs'  and  other  class  members'  time  in  Defendants'  labor trafficking scheme, the Plaintiffs and other class members experienced economic injuries and emotional distress, including stress, sleeplessness, anxiety, humiliation, and fear of being deported, of being harmed, of their family members back home being harmed, and of the consequences of being unable to pay back their loans.

159.     When the Plaintiffs and other class members left the Defendants' captivity, they still owed money on the loans they had to take on to pay their pre-employment expenses.

160.     After escaping  from  the  Defendants'  captivity,  the  Plaintiffs  and  other  class members  continued  to  suffer  emotional  distress  caused  by  their  time  working  under  labor trafficking conditions.

## CLASS ACTION ALLEGATIONS

161.     The named Plaintiffs seek to represent a class consisting of all H-2A temporary foreign workers who were employed pursuant to temporary labor certifications issued to the Contractors.

162.     The class members are so numerous and so geographically dispersed as to make joinder impracticable.  The precise number of individuals in the class is known only to the Traffickers.  However, the class is believed to include over 400 individuals.  The class is comprised of indigent foreign migrant workers.  The class members are not fluent in the English language and are unfamiliar with the American judicial system.  The relatively small size of the individual

claims and the indigence of the class members make the maintenance of separate actions by each class member economically infeasible.

163.    There are questions of law and fact common to the class.  These common legal and factual questions include:

(a)    Whether the Defendants were obligated to provide the class members with adequate living conditions and food without charge;

(b)    Whether the Defendants were obligated to reimburse the class members for expenses the class members incurred, including transportation, housing, and food;

(c)    Whether the Defendants recruited, harbored, transported, obtained, and/or provided—or conspired to do so—the Plaintiffs and other putative class members for the purpose of subjecting them to forced labor;

(d)    Whether the Defendants used and/or threatened—or conspired to use and/or threaten—the Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to provide and obtain Plaintiffs' and other putative class members' labor or services;

(e)    Whether the Defendants knowingly benefitted from participating in a venture that the Defendants knew or should have known was engaged in providing and obtaining Plaintiffs' and other putative class members' labor or services through actual or threats of physical restraint, serious harm, and/or abuse of the legal process; and

(f)    Whether the Defendants knowingly benefitted from participating in a venture they knew or should have known was engaged in the recruitment, harboring, transporting, obtaining, and/or providing the Plaintiffs and other putative class

28

members for the purpose of subjecting them to forced labor, trafficking for forced labor, and/or document servitude;

164.    The claims of the Plaintiffs are typical of those of the other class members and these claims predominate over any questions affecting only individual class members.

165.    The Plaintiffs have the same interests as do other members of the class and will vigorously prosecute these interests on behalf of the class.

166.    Counsel for the Plaintiffs are experienced in handling class actions by H-2A workers to enforce their rights under their employment contracts and have handled numerous class actions in the federal courts, including class actions on behalf of H-2A workers bringing claims similar to those presented in this action.  Plaintiffs' counsel is prepared to advance litigation costs necessary to vigorously litigate this action and to provide notice to the class members under Rule 23(b)(3).

167.    A class action under Rule 23(b)(3) is superior to other available methods of adjudicating this controversy because, *inter alia*:

(a)    The common issues of law and fact, as well as the relatively small size of the individual class members' claims, substantially diminish the interest of members of the class in individually controlling the prosecution of separate actions;

(b)    Many members of the class are unaware of their rights to prosecute these claims and/or lack the means or resources to secure legal assistance;

(c)    There has been no litigation already commenced against the Defendants by the members of the class to determine the questions presented;

(d)     It is desirable that the claims be heard in this forum because the Defendants reside in this district and the acts giving rise to the causes of action set out herein arose in this district; and

(e)     A class action can be managed without undue difficulty because the Defendants have regularly committed the violations complained of herein and were required to maintain detailed records concerning each member of the class.

## CAUSES OF ACTION

## COUNT I

## (Violation of the Federal Forced Labor Statute Against the Defendants)

## (18 U.S.C. § 1589)

168.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

169.    The Defendants knowingly provided and obtained the labor or services of the Plaintiffs and other class members by means of actual and threatened force and physical restraint.

170.    The Defendants knowingly provided and/or obtained the labor or services of the Plaintiffs and other class members by means of serious harm and/or threats of serious harm.

171.    The Defendants knowingly provided and/or obtained the labor or services of the Plaintiffs and other class members by means of a scheme, plan, or pattern intended to cause the Plaintiffs and other class members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

172.    As a result of the Defendants' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be proven at trial.

VP/#62947478.5

173.     As a result of the Defendants' conduct, the Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by a jury or the Court.

174.     The Defendants' conduct warrants the Court's imposition of punitive damages against the Defendants.

175.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## COUNT II

**(Trafficking with Respect to Forced Labor Against the Defendants)**

**(18 U.S.C. § 1590)**

176.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

177.     The Defendants knowingly recruited, harbored, transported, provided, and/or obtained by any means, the Plaintiffs and other class members for their labor or services in violation of Chapter 77 of Title 18 of the U.S. Code.

178.     As a result of the Defendants' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be determined by a jury.

179.     As a result of the Defendants' conduct, the Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by a jury.

180.     The Defendants' conduct warrants the Court's imposition of punitive damages against the Defendants.

VP/#62947478.5

181.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Traffickers' wrongful conduct.

## COUNT III

### (Unlawful Conduct with Respect to Documents in

### Furtherance of Forced Labor and Trafficking Statute Against the Defendants)

### (18 U.S.C. § 1592)

182.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

183.     The Defendants knowingly concealed, removed, confiscated, and possessed the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, in the course of violating 18 U.S.C. §§ 1589 and 1590.

184.     The Defendants knowingly concealed, removed, confiscated, and possessed the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, to prevent or restrict or attempt to prevent or restrict, without lawful authority, the Plaintiffs' and other class members' liberty to move or travel, in order to maintain their labor or services.

185.     The Defendants' conduct warrants the Court's imposition of punitive damages against the Defendants.

186.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

VP/#62947478.5

## COUNT IV

**(Conspiracy to Commit Forced Labor and Trafficking With Respect to Forced Labor)**

**(18 U.S.C. § 1594)**

**(Alternative Claim Against the Growers)**

187.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

188.    Plaintiffs bring this claim against the Growers in the alternative to the claims against Defendants set forth in Counts I, II, and III *supra*.

189.    The Contractors committed the violations of 18 U.S.C. §§ 1589, 1590, and 1592 as set forth in Counts I, II, and III, *supra*.

190.    The Growers intentionally agreed that the Contractors would commit the violations of 18 U.S.C. §§ 1589, 1590, and 1592 set forth in Counts I, II, and III, *supra*.

191.    Defendants Growers intentionally committed overt acts in furtherance of the Contractors' violations of 18 U.S.C. §§ 1589, 1590, and 1592 as set forth in Counts I, II, and III, *supra*.  These overt acts included, but were not limited to:

(a)    Assisting with the recruitment of the Plaintiffs and other class members;

(b)    Agreeing to be named as a grower (Triple T Family Farms, LLC) in fraudulent submissions to the government intended to obtain the Plaintiffs' and other class members' labor;

(c)    Housing the Plaintiffs and other class members in substandard conditions causing psychological deterioration;

(d)    Paying the Plaintiffs and other class members sub-minimum wages.

VP/#62947478.5

(e)     Upon information and belief, knowingly encouraging the Contractors to sell the Plaintiffs and other class members to other employers .

192.    As a result of the Growers' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be determined by a jury or the Court.

193.    As a result of the Growers' conduct, the Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by a jury or the Court.

194.    The Growers' conduct warrants the Court's imposition of punitive damages against the Traffickers.

195.    Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Growers' wrongful conduct.

**COUNT V**

**(Benefitting Financially from Violations of Chapter 77 Against All Defendants)**

**(18 U.S.C. § 1595(a))**

196.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

197.    Pursuant to 18 U.S.C. § 1595(a), the Defendants s knowingly benefitted, or attempted or conspired to benefit, financially and/or by receiving things of value, from participation in a venture they knew or should have known has engaged in violations of 18 U.S.C. §§ 1589, 1590, and 1592.

198.    The Defendants' conduct warrants the Court's imposition of punitive damages against the Defendants.

199.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## COUNT VI

## (FAIR LABOR STANDARDS ACT)

200.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

201.     At all times relevant to this action, the Defendants were the Plaintiffs' employers because the Defendants acted directly or indirectly in the interest of an employer in relation to the Plaintiffs.[6]

202.     At all times relevant to this action, the Defendants employed the Plaintiffs because they suffered or permitted the Plaintiffs to work.[7]

203.     At all times relevant to this action, the Plaintiffs were economically dependent on all Defendants.

204.     At all times relevant to this action, Plaintiffs were employed by Defendants in an enterprise engaged in interstate commerce or the production of good for interstate commerce.

205.     Plaintiffs incurred various immigration, visa processing, and travel expenses to come to work for the Defendants in the United States.

206.     The Defendants and/or their agents in Mexico, required, as a condition of hire, that each Plaintiff pay a sum of money associated with their recruitment.

207.     During recruitment, the Defendants and/or their agents, promised the Plaintiffs a wage rate that was consistent with the H-2A regulations, which was the higher rate between: (a) the

---

[6] *See* definition of "employer" at 29 U.S.C. § 203(d).
[7] *See* definition of "employ" at 29 U.S.C. § 203(g).

VP/#62947478.5

applicable minimum wage; (b) the applicable prevailing wage; and (c) the Adverse Effect Wage Rate of $11.71 per hour.

208.    The Defendants failed to reimburse any of the pre-employment expenses that the Plaintiffs incurred primarily for the benefit of the Defendants.

209.    When work commenced in Georgia, the Defendants assigned work to the Plaintiffs that included agricultural and non-agricultural work.

210.    In addition to farm work, the Plaintiffs performed various non-agricultural tasks during their employment with the Defendants, including yard work in private homes, planting pine trees, raking and bailing pine straw, and home renovation and maintenance.

211.    In some weeks during their employment with the Defendants, the Plaintiffs worked in excess of 40 hours a week.

212.    The Defendants failed to pay the Plaintiffs the minimum wage of $7.25 per hour for all hours worked, in violation of the FLSA minimum wage provisions.[8]

213.    The Defendants failed to pay the Plaintiffs one and one-half times the regular rate of pay for hours worked over 40 in any workweek, in violation of the FLSA's overtime provisions.[9]

214.    The violations set forth in this action arose, in part, from the Defendants' failure to reimburse the expenses the Plaintiffs incurred primarily for the benefit of the Defendants, and which brought the Plaintiffs' earnings below the required minimum wage rate.

215.    The violations set forth in this action also arose from the Defendants' failure to supplement the Plaintiffs' wages to equal or exceed the federal minimum wage.

[8] 29 U.S.C. § 206(a).
[9] 29 U.S.C. § 207(a).

VP/#62947478.5

216.    As a result of the Defendants' violations of the FLSA, the Plaintiffs are entitled to recover their unpaid minimum and overtime wages, plus an additional and equal amount in liquidated damages, reasonable attorneys' fees, and the costs of this action.[10]

## DEMAND FOR TRIAL BY JURY

217.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by this First Amended Complaint.

## PRAYER FOR RELIEF

218.    The Plaintiffs respectfully request that this Court grant the following relief:

(a)     Accept jurisdiction of this cause;

(b)     Certify this case as a class action in accordance with Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to all claims, except claims under the Fair Labor Standards Act;

(c)     Certify this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to claims under the Fair Labor Standards Act;

(d)     Grant judgment against Defendants in favor of the Plaintiffs and other class members, for violations of the TVPA, 18 U.S.C. §§ 1589, 1590, 1592, 1594, and 1595,  as proved, for their economic damages, non-economic damages, and punitive damages;

(e)     Grant judgment in favor of Plaintiffs and against Defendants, jointly and severally, on the Plaintiffs' claims under the Fair Labor Standards Act, and award each Plaintiff their unpaid wages, plus an equal amount in liquidated damages;

---

[10] 29 U.S.C. § 216(b).

VP/#62947478.5

(f)     Award Plaintiffs pre-judgment and post-judgment interest, the costs of this

action, and reasonable attorney's fees; and

(g)     Grant such further relief as this Court deems just and proper.


This 12th day of October 2023.                     Respectfully submitted,

EDWIN AGUILAR-ROBLERO,
JOSE CRUZ-HERNANDEZ,
MARCOS FLORES-REYES,
VICTORINO
HERNANDEZ-HERNANDEZ, JOEL
HERNANDEZ-RAMOS,
NEYMAELIN LOPEZ-MATIAS,
AGUSTIN MIGUEL-FELIX,
ROSENALDO RODRIGUEZ-VAZQUEZ,
EMMANUEL ROMERO-GRAJALES,
DAVID RUBIO-HERNANDEZ, AND
ERICK ZAVALA-HERNANDEZ

BY: /s/ Daniel Werner
Daniel Werner (GA Bar No. 422070)
RADFORD SCOTT, LLP
315 W.  Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
Tel: (678) 271-0304
E-mail: dwerner@radfordscott.com

BY: /s/ Charlie Y. Wang
Charlie Y. Wang
(CA Bar No.  320236)
(*Pro Hac Vice*)
VEDDER PRICE (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
Tel: (424) 204-7700
E-mail: cwang@vedderprice.com

**NOTICE COUNSEL:**

Anand Ramana (D.C. Bar No. 489478)
(*Pro Hac Vice* Application Forthcoming)
Eleanor C. Callaway  (D.C. Bar No. 90003843)
VEDDER PRICE P.C.
1401 New York Ave N.W.
Suite 500
Washington, D.C.  20005
Tel: (202) 312-3325
E-mail: aramana@vedderprice.com

Dana Mehlman (Illinois Bar No. 6302515)
(*Pro Hac Vice*)
Allison Czerniak (Illinois Bar No. 6319273)
(*Pro Hac Vice* Application Forthcoming)
VEDDER PRICE P.C.
222 North LaSalle Street,
Chicago, Illinois 60601
Tel: (312) 609-7509
Tel: (312) 609-7626
E-mail: dmehlman@vedderprice.com
E-mail: aczerniak@vedderprice.com

VP/#62947478.5

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 12, 2023, a true and correct copy of the foregoing

- **FIRST AMENDED CLASS ACTION COMPLAINT**

was electronically filed with the Clerk of the Court using the CM/ECF system, to:

TRIPLE T FAMILY FARMS, LLC
Registered Agent: Carter Krystal Tanner
156 Ohoopee River Road,
Wrightsville, GA, 31096, USA

CARTER KRYSTAL TANNER
156 Ohoopee River Road,
Wrightsville, GA, 31096, USA

ASOCIACION CAMPESINA DE DESARROLLO DE LAS COMUNIDADES DE
GUATEMALA, LLC
204 Circle Dr
Douglas, GA 31533

☒      by having transmitted via e-mail the document listed above to the person(s) at
the e-mail address(es) set forth below

NERY RENE CARRILLO-NAJARRO
nrene.carrillo@gmail.com
ascarrillo0916@gmail.com

Respectfully submitted this 12th day of October, 2023.

/s/ Charlie Y. Wang
Charlie Y. Wang